155163 Kentucky Coal Association et al. v. Tennessee Valley Authority Arguments not to exceed 15 minutes per side Mr. Kelly for appellants Hold up just one second, let everybody get settled on both sides Good afternoon, I'm Don Kelly with Wyatt Tarrant Combs in Louisville. On behalf of the appellants, a number of property owners near the Paradise facility in Kentucky and the Kentucky Coal Association, and Judge Boggs, I'd like to reserve two minutes if I may. You may. Thank you, Your Honor. In the spring of 2011, TVA had finalized its Integrated Resource Plan, which by its own statements required two years of extensive analysis. Shortly thereafter, the EPA finalized what I refer to as MATS, its Mercury and Air Toxic Standards. In the summer of 2012, TVA had a MATS compliance solution for its Paradise station, which was approved and budgeted by its Board of Directors. It was going to add bag houses to Units 1 and 2. It easily met the MATS timeline. It was consistent with the planning directives that they had just spent two years studying and adopting. As the EA, the Environmental Assessment, confirmed, it complied with NEPA and created no significant impact on the human environment. For whatever unwritten policy reasons, in the summer of 2012, TVA decided that MATS, which is now, as I've noted in my letter earlier, has been deemed to be not properly authorized. TVA decided it provided an opportunity to change course, close down Paradise Unit 1, Unit 2. You're saying both of these things happened in 2012? In 2013, Your Honor. In 2012, TVA came out with a decision that would comply with MATS, which had been adopted in 2011, the end of 2011. It had its integrated resource plan in 2011. MATS came out in 2011. In 2012, it came up with its plan to add bag houses. And in 2013, it reversed course in the summer of 2013. And in doing so, Your Honors, it ignored the analysis and the specific planning directives that it had just spent those two years adopting and creating. Would a description of how a bag house works take more than 30 seconds? I'm a mechanical engineer, Your Honor, and I think I can answer that question. I see the dummies. I actually worked at a power plant. At the end of the, so you burn the coal, it goes through the boiler, and what is left, you've got fly ash in that. So you add a bag house to collect that fly ash or whatever is going through it. Correct. Covering to further filter. Correct, that's what it does. It further filters and reduces the air toxics that they want to get to. So in changing course, they disregarded the mandate that they had adopted to provide a detailed optimization analysis if they were going to idle specific coal units. They contradicted the recommendations that were in their own IRP, and they disregarded their own need for policies, which would normally require an EIS, an environmental impact statement, when constructing a major power generating facility. They deferred the analysis of environmental impact to other agencies at a future time because, frankly, by the summer of 2012, if they were going to reverse course and put in a brand new gas generating facility. Again, you said 2012. Did I say that? I'm sorry, Your Honor. So the about face happens between April and August of 2013. Correct. Because I believe you said that I thought the date at which they had said they could comply with MATS with the bag houses was only a few months before the new decision. Correct, Your Honor. Okay. Correct. And they created this urgent timeline of their own doing. One of the issues that came up in the lower court, Judge Judge McKinley, is, well, we can't put in, we have to go down this way because MATS is complying these dates. Back in 2013. Why is it their own doing if MATS imposes it? Well, they had a position that they had taken on the bag house that was going to comply. I mean, you know, you're allowed to switch course. No. I don't know why it's of their own doing. I'm not suggesting they're not allowed to switch course at all. They have the right to set their policies, and they have the right to decide whether or not they're going to put in coal or gas or build a new power plant. There's no question about that. What we're suggesting, Your Honor, is they have to do that according to the law, and they have to do that according to the TVA Act, and they have to do that according to NEPA. And what they didn't do and what we submit didn't happen was when they reversed that course, they completely contradicted what their own integrated resource plan had suggested that they needed to do and what their board adopted that they'd be doing. So, first of all, just to make sure we're on the same page, and I think you're implicitly agreeing with this, they're allowed to incorporate the findings from the 2011 plan in making their decision once they switch to gas. In terms of least-cost alternative, they can incorporate some of those findings. They don't have to start anew. You're agreeing with that? I am agreeing with that, Your Honor. Okay. And let me address that, the TVA Act claim on that, because what this two-year study did is it reviewed all the various scenarios that they thought were going to happen for the next 20 years or five years, because, frankly, they committed to doing another one beginning in this year, and they looked at eight specific scenarios, and they looked at what would happen in the economy, and they looked at what happened with technology, and they looked at what happens with regulations, and they looked at very specific portfolios. Would they diversify their portfolio? Would they go with more gas? You said the two-year study led to the 2011 IRP? Correct, Your Honor. Okay. Correct. And they came up with all these analyses, and it's very detailed, and they even put into their administrative record the draft analysis and the final IRP. And in doing all those studies and looking at how much coal was going to be idled in each one, they looked specifically at whether or not they should idle between zero and 7,000 megawatts, and they looked at that, and they said 7,000 is not cost-effective. So they went back, and they looked at their strategies, and they did a grading chart, and it's in their administrative record, and they looked at various strategies, and they again said, okay, well, let's look and see, what if we expand it to 7,000 here? And again, they came back and said, no, that's too much coal. It's not least-cost system planning. And they ultimately adopted a provision that would say they were going to idle between 2,400 megawatts and 4,700 megawatts of power, with 4,000 megawatts being the optimum amount. They immediately, so they adopted that in their IRP. They immediately then ---- At the time they do that, maths hasn't been finalized. Correct. It may be on the horizon, depending on who's elected to what, but it's not finalized. Okay. Fair enough, Your Honor. Certainly on the drawing boards and people knew it was coming out, it had not yet come out. So your point is they're idling more than might have been optimum under one scenario, but you have to acknowledge that idling more is cleaner. So, I mean, this is all costs and benefits, right? Well, it's ---- It is cleaner, of course, right? It depends on what you're going to idle to do it. If you're going to ask me do I think that absolutely idling a coal plant and building a brand-new gas plant is cleaner, in some ways it is. It certainly is cleaner some. It's not cleaner in the way that, you know, gas is fracked. I mean, there's all kinds of people suing all around the country that say natural gas fracking is terrible. So I would agree that that is their starting position, that they can do that. But they have to study that. Their own IRP, their least-cost planning says 7,000 is too much. There's a sort of query here about the least cost versus the environmental. I mean, as I read it, correct me if you think I'm wrong, they said, look, gas is going to put less particulates and that kind of stuff. It's going to put less CO2. We are going to have to disturb land, and we are going to have to build a pipeline. But that's the tradeoff. My other question is, as of now, natural gas looks a lot cheaper than it did in 2009 when they started doing the two-year study or even in 2011 when they finished it. Are they entitled to take that into account? Your Honor, they're entitled to take anything. They can do that, but they have to do the study. What their own recommendation in their approved plan in 2011, that really looked at CO2 and looked at how much natural gas was going to be costing, and it looked at the environmental issues of that, they're the ones who did this detailed study and said 4,000 is the right number. 7,000 is too much. They then said that if we're going to idle any specific plant, we will perform a detailed optimization analysis to the study, the cost, the benefits, and the uncertainties and risks. That does not appear in this administrative record. It's not to say that they can't do it. It's to say that they did not do it. They said 7,000 is too much. I guess the point you wish us to draw from that is that the action was arbitrary and capricious. I would suggest that's exactly the point, Your Honor, because I think that what they have to do is they have to support. . . environmental impact that would come out differently. Is that the hope here? Well, I wouldn't say that's the hope, Your Honor. I would suggest to you that our expert reports would say that it would come out differently. And, again, I want to draw a difference between the environmental aspects, which is the NEPA analysis, and the TVA Act, which is leased system cost planning. But to answer your question, they have to do both. They have to comply with both, and they have to support that in the administrative record. And we would suggest to you that we think it would come out differently. But . . . But from an EIS point of view, does the change in, for example, gas prices, is that something that requires a new EIS as to whether that doesn't affect the human environment directly? I would not suggest that, Your Honor. I don't think the change in the gas . . . I think that on the EIS standpoint, the problem that I see with this record is they did an environmental analysis, switching over to that, and they first didn't support the whole . . . They have a procedure that says they will normally prepare an environmental and EIS statement if they're going to build a major new generating facility. There's no question that this is a major new generating facility. There's also no question that they did not perform an EIS. So the answer is why. Well, first the EA says, well, because we're going to be maintaining a system. And when the commenters came in and said, well, you're not really maintaining it, well, then we're going to be . . . The next issue was, well, it's continued operation and maintenance of that. And they said, no, that's not it. So then when we got . . . We filed our lawsuit, and the first response was, well, they abandoned those two, and normally doesn't mean always. I agree with that. Normally certainly doesn't mean always. But there's clear case law that the administrative record has to support why you are not going to follow your own procedures. They were adopted pursuant to the CEQ. They were published. They were put out to comment. And that's what their procedures are. So then they came up with the last argument, which was in their brief before Judge McKinley at the end, was, well, normally only applies if we're going to be adding generation to a green field or if we're not going to be retiring other facilities. Well, there's a couple problems with that. One, that is nowhere in the published record. It's nowhere in the administrative record. And if the position is, well, as long as we're going to retire dirty coal, we can build all the new gas we want, ignoring the fact that that was studied by the TVA, the IRP, that means that they could build as many new facilities without ever preparing an EIS as they want, contrary to their own normally required policies. The statement about normally required, is that in the IRP or what is it in? It's in the TVA's internal policies. Every agency, every federal agency has to prepare procedures and policies for implementing NEPA. And if you look at the back of the EA, it lists their environmental assessment, it lists their own policies and procedures. And it says when we will not prepare an EIS, when we will automatically prepare an EIS, and when we will normally prepare an EIS. And they will normally prepare an EIS if they're building a major new generating facility. And we suggest to your honors that there is nothing in this administrative record which shows why they deviated from that and that needed to be in there. Doesn't the whole assessment, I mean, this isn't the back of the envelope, it's pretty comprehensive, it's not as big as the whole EIS, that's your whole point. But doesn't the EA basically lay out why they believe the amount of impact on the human environment is not enough to require an EIS under the whole EA versus EIS regulations? It does from the standpoint of going through the factors that they say that they look at. The problem with those factors, which is a different analysis as to why we would or wouldn't normally. The law, I would suggest to your honor, what we cite is they have to show where in the administrative record they would deviate from their normal procedures. They haven't done that. I would agree with you that their analysis says what it says. So you're saying that even though if we credit that there's much less impact on the environment than would require an EIS, we also have to say, and that's the reason that we're not doing what we normally do. I wouldn't simplify it quite that much, and I know what time it is, but let me answer the question. The premise of what you just suggested is a weighing of environmental benefits and environmental detriments. That is specifically the charge of an EIS. An EA looks at will there be impacts or not. If yes, or if we don't know because FERC hasn't done its analysis yet, then you either wait for FERC to do their analysis or you do an EIS. This is a funny position for your client to take. How many briefs out there have you guys filed where you're saying it was wrong to stop at the EA? Your honor, I'm going to guess it's the first. I don't know the answer to that question. I understand the dichotomy certainly that you've noted and they had noted to us as well. It's a question of following the law, your honor. We believe that right or wrong in between, it is what it is. We're a rule of laws. The TVA Act was passed. NEPA was passed. Procedures were passed. They should be followed. Thank you, counsel. You'll have your time for rebuttal. Good afternoon, and may it please the court. My name is Regina Coho, and I'm here on behalf of the Appley, the Tennessee Valley Authority. If I could just begin by clarifying a few points about the timeline. The MATS rule was not actually finalized until April of 2012. Then in August of 2012, the TVA board gave provisional approval for the bag houses on Units 1 and 2 at Paradise, subject to an appropriate environmental review. The draft EA was then issued a year later in August 2013, and the final EA was in November of 2013. Now, those are the EAs on the bag houses? Yes, your honor. And I'd just like to touch on a few points. As Judge McKinley does say on the first page, in April of 2013, TVA still seemed to be on track to upgrade Paradise 1 and 2, and then in August they changed their mind. Well, he might be referencing the fact that there was that provisional approval from the board in August of 2012. Well, he references that, but then he also says in April of 2013, TVA again indicated its intent to upgrade Paradise 1 and 2 on the first page of his opinion. Okay. I'm not exactly sure what that's referring to. I know that in November of 2013, the board did then go on to approve the gas plant after the environmental review had been finalized. It says in August TVA announced a change in its position. So my understanding, starting from that opinion, was that the U-turn was between April and August of 2013. Do you have any view on what caused that? Well, I think that what caused the change was the result in the environmental review, which showed that the gas plant was the more environmentally beneficial. So when did the environmental review of the gas plant start? I believe it began shortly before the board gave its provisional approval. I don't know that this is actually in the record, but I know from discussions with our NEPA staff that the NEPA process actually began in July 2012. Okay. Go ahead. If I could touch on a few points related to the Plaintiff's Energy Policy Act claim. Plaintiffs make much of the fact that there was a recommended planning direction in the IRP that suggested that 4,700 megawatts of coal-fired idling was recommended based on the analysis in the IRP. But it's very important to note that it also went on to recommend increasing the idling of coal capacity, and that's found at the AR 1831 and also in the record of decision for the IRP, which is at AR 2354. So clearly TVA was contemplating the fact that should things change after issuance of the IRP, it may make sense programmatically to go beyond the recommended planning direction, the 4,700 megawatts of coal-fired idling. And I would also point out that the guideline range for natural gas additions was 900 to 9,300 megawatts, and that can be found at AR 1831. So this suggests that there was a great deal of flexibility retained by TVA in determining subsequent to the IRP. So if you added the high end of that, what did you say, 9,000 megawatts for gas? It was 9,300 was the high end. But then presumably that might depend on what's happening to your load as to how much coal that would retire. That's true. You might want to add all that gas and then not retire as much if your load requirements required it, but you'd retire more if you didn't need them. Yes, and I could speak a little bit to the fact that I think the plaintiffs have claimed that the gas plant is not going to service TVA's system in the same way that Units 1 and 2 do, and that's actually incorrect. The CTCC, Combustion Turbine Combined Cycle Plant, that will be built at Paradise, can function as a base load if it's needed to, which is what the coal-fired units function as, but it also allows for peaking generation. So if there's a higher need on the transmission line system or a lower need, it can respond to that, and the coal-fired units simply cannot do that. So maybe a little more on your response to their point that you spend all this time with the IRP, it comes to 4,700, and then you say, well, okay, maybe you don't need another two years of study, but why wouldn't you have to reassess things before you go to 7,000? I mean, it doesn't seem it's as simple as coal's dirty. It doesn't seem like it's that simple. It's not that simple, and I would point out the fact that the IRP, it recommended that if TVA decided to go beyond the 4,700 megawatts, that it perform detailed optimization analysis. So there's a document in the administrative record, AR DOC 12, which is a high-level summary of analysis that TVA staff did and then presented to a committee of the TVA board that specifically looked at the different coal-fired units that were being retired and the impact of the retirement of Paradise and did the comparison between the gas plant and the coal-fired units. And again, it's a high-level summary, but that analysis was done. I mean, there's nothing that requires that analysis to be done in a specific way. It does need to be done, but that is summarized. Are there any significant differences in our standard of review or way of reviewing this plan with respect to NEPA as opposed to with respect to the TVA and energy law? Well, I think the NEPA review is clearly arbitrary and capricious. With regard to the IRP, it is an agency decision, but it's almost more deferential than arbitrary and capricious because – There's something more deferential? Well, some of the case law speaks about the zone of reasonableness when an agency's kind of expertise is implicated. I think one case that I can think of that we cited in our brief was the NRA Permian rates basin case. So it's kind of a zone of reasonableness. I don't know that it's ultimately different than the arbitrary and capricious, but it is quite differential. So how does this work with the pipeline? So FERC's a different agency. Yes. But if you start down this road, isn't it kind of a fait accompli? I mean, is it really possible that FERC's going to do an assessment and shut the whole thing down? Well, FERC really has no vested interest in whether TVA is able to build its gas plant. It has a specific duty to approve and before – But the whole idea of these assessments is to do cost-benefit of everything, and here you're locking in certain costs and certain benefits, so you've – Well, if we accepted the plaintiff's arguments as true that we had to wait for FERC to do the review, that would essentially mean that TVA would have to have contracted with the gas pipeline company, which would be – that would be a clear impermissible predetermination because the gas pipeline company is not going to submit an application to FERC and incur the cost of doing its pipeline routing and environmental review if it doesn't have a firm commitment from – I take it if, for whatever reason, FERC were to deny the pipeline a permit, you would just keep running these coal plants, right? You're not going to shut them down before you – or am I wrong? Shut them down before you start building – even start breaking ground on the gas plant. Well, I guess we would have to make that decision. I mean, this is a critical plant, so, you know, we would have to weigh the benefits between maintaining reliability and being fined by EPA for noncompliance with MAT, so I'm not sure. I take it there's no mechanism in the federal government to get agencies to coordinate. We're doing the assessment, we're deciding whether to go to an EIS, and we think your input would be helpful. I mean, that sounds too logical for the federal government. The statute to do that back around in the late 70s, and it didn't pass. Isn't that pretty close? Yeah, we want you all being all Indians, no chiefs. Yeah, just go out and do your own thing. Well, I think that the regulations do contemplate agencies being cooperating agencies, but I don't think there's anything in the regulations that specifically require the precise level of coordination that the plant needs. Well, I was just thinking of permitting it, just allowing it, just allowing the two agencies to say, hey, we're doing this, let's just do it together. I guess it could happen in theory. It's kind of the facts of this situation did not apply. May I take it at the moment you don't even have a particular pipeline company to provide the gas or to build the pipeline? That's exactly right. If you had that, then what Judge Sutton was indicating might be a good idea. Right. I mean, at the time we were performing the EA, we were just in discussions with the gas pipeline companies because, as I mentioned previously, if we had contracted with the gas company and they could tell us exactly where they wanted to. Am I correct even as of now you haven't done that or have you? No, we have contracted with a gas company at this point. Is that Texas Gas? Texas Gas, yes, that's correct. If I could just touch briefly on the EA versus EIS issue, Judge Boggs, I think you hit the nail on the head when you said, well, isn't the EA that results in the FONSI, isn't that the analysis that is necessary to show that this major power generating facility is not one that normally requires an EIS? And that's exactly correct. There's nothing in NEPA, there's nothing in the CEQ regulations, there's nothing in TVA's regulations that require TVA to make an additional statement saying that this is a project that does not normally require an EIS. And unless there are any further questions, we would simply ask that the district court be affirmed. Thank you. We'll have your time for rebuttal. Judge Sutton, you were right on point. It is a fiat compli. It is a what? It is a fiat compli to be done. That's the whole problem. What NEPA does require and what the CEQ guidelines and regulations do require is for these agencies to cooperate with each other. And if you're going to have to wait for another agency to make its determination, you either have to stop, wait for that to be done, to see whether that's going to be a major problem or not, or you have to prepare your own EIS and make that determination for yourself. Is your theory that they would have done all this coordination but for the MAPS deadlines? I think that's true. I think what happened was is they decided in the summer of 12,  and at that point there was not time under the then MAPS requirements to do an EIS. There was not time to wait for the FERC to do its EIS or its EA on this because that's not even done yet, and they had to keep this thing moving if they were going to actually build a baghouse. But that's not TVA's fault. That's Congress's fault. It's not TVA's fault. Well, what TVA had to do was they had to come up with a determination when MAPS was first passed, and are we going to go with a baghouse, or are we going to go with building natural gas, or are we going to go with whatever. They had a solution for well over a year that complied with all of that. You know, I mean, counsel for TVA just said, I mean, I think you're right. There's certainly a lot of inertia, but the FERC has no obligation when it comes time to do the assessment, and they're going to have to call it the way they call it. I agree. If they say no, they'll have to come up with some other option. Well, we'll see. I agree with you in theory that's true, but the point of what we're saying is I do think that the requirements are that they either perform their EIS or they wait. Many of the cases that the Sixth Circuit has done, I was going to comment on the Kentuckyans for the Commonwealth versus the Army Corps. It talks about the coordination that was going back and forth between the governmental agencies when one was doing the EIS and one was doing this EIS, and they were relying on each other. That's the way it is supposed to work. It isn't like this is the first time that a natural gas plant has been prepared. My time is up, so I will. Anything else? All right. Thank you. I appreciate you. The case will be submitted.